**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **MIGUEL ANGEL COMPEAN,** | § | |
| **Movant,** | § | |
| | § | |
| **v.** | § | **MO:12-CR-340(1)-RAJ-DC** |
| | § | **MO:14-CV-00041-RAJ-DC** |
| **UNITED STATES OF AMERICA,** | § | |
| **Respondent.** | § | |

**REPORT AND RECOMMENDATION TO DENY MOVANT'S MOTION TO VACATE, SET
ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 (D.E. 100)**

Before the Court are Movant Miguel Angel Compean's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, (D.E. 100); and the Government's Response. (D.E. 113). Pursuant to 28 U.S.C. § 636(b)(1) and Appendix C of the Local Rules for the Assignment of Duties to the United States Magistrates, this Motion to Vacate is before the United States Magistrate Judge by referral from the United States District Judge for a Report and Recommendation including proposed findings of fact and recommendations for disposition. (D.E. 108). After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the United States Magistrate Judge **RECOMMENDS**, for the reasons set forth below, that Movant's Section 2255 Motion to Vacate, Set Aside or Correct Sentence, (D.E. 100) be **DENIED** and that this Section 2255 proceeding be **DISMISSED WITH PREJUDICE**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On December 19, 2012, a federal Grand Jury for the Western District of Texas sitting in the Midland/Odessa Division, returned an Indictment charging Movant, Michelle Compean (Movant's wife), and Brian Connell with ten offenses against the United States. (D.E. 9). With respect to Movant, the Indictment charged him in Count One with conspiring to smuggle firearms from the United States into the Republic of Mexico, in violation of 18 U.S.C. §§ 371, 554; in Counts Four,

Six, Nine, and Ten with supplying false written statements in connection with the purchase of firearms, in a violation of 18 U.S.C. § 922(a)(6); in Counts Five and Seven with unlawfully using the identification of another person, in violation 18 U.S.C. § 1028A; and in Count Eight with aiding and abetting the supplying of false written statements in connection with the purchase of a firearm, in violation of 18 U.S.C. §§ 2, 922(a)(6). (*Id.*).

On February 11, 2013, Movant, pursuant to a written Plea Agreement, appeared before the undersigned Magistrate Judge and pleaded guilty to Counts One, Four, and Five of the Indictment. (D.E. 54 at 1, 8). The Factual Basis attached to that Plea Agreement read as follows:

> In 2012 agents with the Bureau of Alcohol, Tobacco, and firearms (ATF) began investigating a gun smuggling ring in the Midland/Odessa area. Agents received information that Brian Connell was purchasing firearms for another individual (later identified as [Movant]) and that Connell was recruiting people to purchase firearms. Agents also received information that [Movant] lived next door to Connell at the time, and was also purchasing firearms to be "sent off." Agents learned that Connell also traveled to gun shows in the Dallas/Fort Worth area to purchase firearms for resell.
>
> On December 5, 2012 Agents executed a search warrant at the house of Brian Connell in Odessa, Texas. On the same date agents spoke to Connell in Greenville, Texas. Connell admitted that he had sold around six AK type firearms to [Movant]. Connell admitted selling the firearms for around $1,000 each. Connell stated that he sold the rifles to [Movant] and that [Movant] had a buyer for the weapons.
>
> Agents had been informed that [Movant] moved to Greenville, Texas. On December 5, 2012 Agents approached the residence in Greenville and made contact with [Movant] and his wife. The agents questioned [Movant] about a firearm that was in the residence. [Movant] claimed the firearm belonged to Brian Connell and [Movant]'s wife. [Movant] agreed to an interview with the agents. [Movant] stated that he had been living in Greenville for one week and lived in Odessa, Texas prior to that. [Movant] admitted that Brian Connell and Michelle Compean purchased firearms for [Movant]. [Movant] stated he had been acquiring firearms for another individual who transported the firearms to Mexico. [Movant] would take firearms to predetermined locations, such as hotel rooms in San Antonio, Texas, and drop them off. Another individual would then pick up the firearms and transport them to [Movant]'s buyer. [Movant] stated the firearms then went to Mexico, through Eagle Pass. [Movant] stated that Connell had purchased approximately 8 to 14 firearms during the last month and that he was paid $300.00 for each firearm. He also stated his wife Michelle Compean had purchased three to four firearms for him. [Movant] estimated that he had acquired about 20 to 30 firearms every three to four months since 2011. All the firearms were AK-type firearms. [Movant] also stated that Connell had made approximately 3 trips to San Antonio to drop off firearms.

[Movant] admitted that he used his uncle J.A.M's identifying information when purchasing firearms. This included the name, social security number, and date of birth. Agents learned that [Movant] is not eligible to purchase a firearm himself based upon his immigration status. [Movant] stated he had purchased firearms 8 to 9 times with his uncle's information.

Agents reviewed records of firearms purchases by [Movant]. The records showed that on September 11, 2012 [Movant] used J.A.M's identifying information to purchase an AK-style firearm bearing serial number 1968AP1847 from the Big Tex Pawn Shop in Odessa, Texas.

(D.E. 54 at 3–4). At the conclusion of the plea hearing, Movant and his attorney, Ms. Tracey Scown, objected as follows to certain portions of the Factual Basis:

**The Court:**        Ms. Scown, do you have a couple of comments?

**Ms. Scown:**        Yes, your honor. . . The Defendant's recollection is that he purchased only three to four times with the uncle's information

**The Court:**        OK.

**Ms. Scown:**        And then . . . he recalls saying that he purchased ten firearms . . .

**Movant:**        Mmmhmm

**Ms. Scown:**        Every three to four months . . .

**Movant:**        Mmmhmm . . . not twenty to thirty.

**Ms. Scown:**        Not twenty to thirty.

**The Court:**        OK. About ten firearms every three to four months?

**Movant:**        Yes, sir.

(E.T. at 1:48:12–48:42). Movant also explained that his wife had only purchased firearms for Movant after he threatened her. (E.T. at 1:48:43–49:58). Since these factual disputes were only material for sentencing purposes, they were not resolved at the plea hearing. (*See* E.T. at 1:51:45–52:45).

The number of firearms attributable to Movant was indeed hotly contested at sentencing. Relying on accounts of Movant's statements to law enforcement officials, the Presentence Investigation Report indicated that "[a] conservative estimate of the firearms [Movant] is accountable for is 105 firearms." (P.S.I. Report at 20). That number was based on Movant's admission that he had

delivered 5 AK-style firearms to a contact in San Antonio in 2010, and Movant's estimation to law enforcement officials that he had acquired 20-to-30 firearms every three-to-four months between April 2011 and December 2012. (*Id.*). The P.S.I. Report recommended an eight-level enhancement based on its finding that the offenses involved more than 100 firearms. (*Id.* at 22).

Movant's counsel filed written objections to the P.S.I. Report and argued that Movant should only receive a six-level enhancement because Movant should only be accountable for between 25 and 99 firearms. (P.S.I. Addendum at 1). In a separately filed Plea Memorandum, Movant's counsel explained that Movant's statements regarding the number of firearms he had acquired had been approximations and that Movant "greatly over estimated the number of weapons." (D.E. 80 at 1). Since counsel's position was that "the weapons were all traceable and specifically enumerated in the evidence and in the [P.S.I. Report]," counsel maintained that the correct number of weapons attributable to Movant was 33, not 105. (*See id.*).

At the sentencing hearing, Movant's counsel conceded (contrary to what Petitioner had claimed at the plea hearing) that he had indeed told ATF agents he had acquired 20-to-30 firearms every three-to-four months. (D.E. 94 at 4:20–21). However, counsel reiterated the argument raised for the first time in her Plea Memorandum that Movant had "over-estimated" the number of weapons involved in the offenses. (*Id.* at 4:9–15). Movant then testified on his behalf as follows:

| | |
|---|---|
| **Movant:** | All the weapons that I bought were bought at stores. Every weapon that I bought had paperwork to it. And there's no way I had so many weapons. That could have raised up a flag anywhere at any time, over a hundred or something weapons. I know it's under 60. It's not a hundred and something like they said. |
| **The Court:** | Well, why did you tell the agent that? You don't dispute that you told the agent that? |
| **Movant:** | Yes, sir. I tried to tell him it was eight to ten every time I bought . . . I purchased them. And I told him it was 20 to 30 on the fourth trip. Third or fourth trip, that's what I was trying to tell him. I was all nervous and scared and I didn't know . . . I didn't . . . I didn't . . . I wasn't thinking right, sir. But that's what I was trying to tell him. |

(*Id.* at 5:1–16). The District Judge then heard testimony from an ATF agent who testified that Movant had told him in an interview on December 5, 2012, that Movant "stated that every three to four months he acquired 20 to 30 firearms and did that over a period of about a year to a year and a half." (*Id.* at 7:2–15). The agent also testified that Movant subsequently added to his statement in an interview conducted after the plea hearing but did not make any changes to his statement with respect to the number of firearms involved in the offenses. (*Id.* at 7:23–8:15).

After hearing from both sides, the District Judge overruled Movant's objection to the eight-level enhancement, explaining as follows:

> The Court finds that the presentence report accurately calculates the number of firearms that were handled by Mr. Compean. He swore when he took his . . . when he pled in this case that the information contained in the plea agreement was accurate and correct. He did that before the magistrate judge. And he's told the agent at least twice. The Court finds that the agent is a credible witness, and the Court denies the objection, the objection that the number of firearms is incorrectly calculated.

(*Id.* at 9:6–15). After overruling another objection to a two-level leadership role enhancement, the District Judge arrived at a total offense level of 30.[1] Coupled with a criminal history category of I, Movant's guideline ranges for custody were 60 months for Count One, 97-to-120 months for Count Four, and 24 months for Count Five. (*Id.* at 11:14–18). The District Judge sentenced Movant to 60 months confinement for Count One and 97 months confinement for Count Four, to be served concurrently; and 24 months confinement for Count Five, to be served consecutively to the other two sentences. The District Judge did not impose a fine, but did sentence Movant to serve a total of three years supervised release. (*Id.* at 15:16–23). Movant did not file a direct appeal.

---

[1] Movant's base offense level was 14. (P.S.I. at 22). The District Judge added an eight-level enhancement because of the number of weapons attributable to Movant, a one-level enhancement because at least one of the firearms had an obliterated serial number, a four-level enhancement because Movant engaged in the trafficking of firearms, a four-level enhancement because Movant had knowledge that at least one of the firearms would be transferred out of the United States, and a two-level enhancement because Movant played a leadership role in the offenses. (*Id.* at 22–23). Movant only challenged the first and last of these enhancements, and he was awarded a three-level downward adjustment for acceptance of responsibility. (*Id.* at 23).

On May 22, 2014, exactly one year from the date upon which Judgment was entered in this case, Movant, through retained habeas counsel, timely filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. (D.E. 100). The Motion to Vacate raised two claims related to the ineffectiveness of counsel: (1) counsel was ineffective in presenting her objection to the eight-level enhancement Movant received because of the number of firearms attributed to Movant, (2) counsel was ineffective in failing to move for a downward departure based upon Movant's immigration status. (*Id.* at 9−19). Respondent filed its Response on September 18, 2014, (D.E. 113), and Movant filed no Reply.

## II.    STANDARD OF REVIEW

A prisoner serving a sentence imposed by a federal court claiming "the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States," may move the court which imposed the sentence to vacate, set aside or correct the sentence. 28 U.S.C. § 2255(a). If the court concludes that the prisoner's motion is meritorious, it must "vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). There are four grounds upon which a federal prisoner may move to vacate, set aside, or correct his sentence: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; and (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *Hill v. United States*, 368 U.S. 424, 426−27 (1962).

Following a conviction and exhaustion of the right to direct appeal, a criminal defendant is presumed to stand fairly and finally convicted. *United States v. Shaid*, 937 F.2d 228, 231–32 (5th Cir. 1991) (en banc), *cert. denied*, 502 U.S. 1076 (1992). Thus, Section 2255 is reserved for violations of constitutional rights and for a narrow range of errors that could not have been raised on direct appeal

and would result in a compete miscarriage of justice if allowed to go uncorrected. *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992). A motion under Section 2255 "may not do service for an appeal," and the movant "must clear a significantly higher hurdle than would exist on direct appeal" in order to obtain relief. *United States v. Frady*, 456 U.S. 152, 165 (1982). Even if the movant alleges an error of constitutional magnitude, he generally may not raise the issue for the first time on collateral review without showing cause for the procedural default and actual prejudice resulting from the error. *Shaid*, 937 F.2d at 232.

### III.   DISCUSSION

Movant maintains that his trial counsel was ineffective during the sentencing stage of the criminal proceedings in the underlying case. (D.E. 100 at 2). Claims based on ineffective assistance of counsel may be raised for the first time in a collateral proceeding, whether or not the issue could have been raised on direct appeal. *Massaro v. United States*, 538 U.S. 500, 509 (2003). The Sixth Amendment guarantees defendants the "right to effective assistance of counsel at every critical stage of the proceedings against them." *United States v. Fields*, 565 F.3d 290, 293−94 (5th Cir. 2009) (quoting *Burdine v. Johnson*, 262 F.3d 336, 344 (5th Cir. 2001)). In order to prevail on an ineffective assistance of counsel claim, the movant must show: (1) that counsel's performance was deficient; and (2) that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–91 (1984). The burden of proof is on the movant who is alleging ineffective assistance of counsel. *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 1999) (citing *Clark v. Collins*, 19 F.3d 959, 964 (5th Cir. 1994)). If the movant fails to prove one of the elements, it is unnecessary to analyze the other. *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994); *see also Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997)

To prove deficient performance, the movant must show that his attorney's conduct fell below an objective standard of reasonableness. *United States v. Juarez*, 672 F.3d 381, 385 (5th Cir. 2012)

(citing *Strickland*, 466 U.S. at 688). The Court applies a strong presumption that counsel's professional conduct was objectively reasonable or might be viewed as appropriate trial strategy. *Strickland*, 466 U.S. at 689; *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999). Deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Fields*, 565 F.3d at 294 (quoting *Strickland*, 466 U.S. at 687). In determining the merits of an alleged Sixth Amendment violation, a court "must be highly deferential" to counsel's conduct. *Strickland*, 466 U.S. at 687. Bald conclusory statements by a defendant are not enough to sustain a claim of ineffective assistance of counsel. *Sayre v. Anderson*, 238 F.3d 631, 635–36 (5th Cir. 2001). The allegations of ineffectiveness must be supported by the record. *United States v. Johnson*, 679 F.2d 54, 58–59 (5th Cir. 1982).

To demonstrate prejudice, the movant must show that the result of the proceedings would have been different but for counsel's unprofessional errors or that counsel's performance rendered the proceedings unreliable or fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 369–72 (1993); *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009). The movant must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. This requires a showing "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Prejudice generally exists only if the defendant demonstrates that he would have received less jail time. *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004).

In this case, Movant raises two claims related to the ineffectiveness of trial counsel: (1) counsel was ineffective in presenting her objection to the eight-level enhancement Movant received because of the number of firearms attributed to Movant, (2) counsel was ineffective in failing to move for a downward departure based upon Movant's immigration status. (D.E. 100 at 9–19). For the reasons explained below, the Court finds that Movant's claims are meritless. As neither of Movant's claims depend on weighing Movant's credibility against that of his trial attorney, the

8

undersigned recommends that Movant's Motion to Vacate be dismissed without conducting an evidentiary hearing.

## A. Failure to Effectively Argue Against An Enhancement Based on the Number of Firearms Attributable to Movant

Movant first argues that counsel should have more effectively argued against the District Judge's imposition of an eight-level enhancement based on his finding that Movant's offenses involved more than 100 firearms. (D.E. 100 at 9–14). In particular, Movant faults trial counsel for failing to "(1) correct the Government's representation to [the District] Court that [Movant] agreed in the plea agreement that his offenses involved over 100 firearms[,] and (2) challenge the Government's extrapolation method to reach the 100 firearm quantity threshold." (*Id.* at 9).

### 1. Failure to Correct the Government's Characterization of the Plea Hearing

Following the agent's testimony at the sentencing hearing, the Assistant United States Attorney (AUSA) pointed out to the District Judge that "in the plea agreement that the Defendant signed it also stated that he had acquired about 20 to 30 firearms every three to four months since 2011." (*Id.* at 8:23–9:2). Of course, Movant actually objected to that portion of the Plea Agreement at the plea hearing, so Movant faults counsel for failing to object when the AUSA "erroneously represent[ed] to [the District Judge] at sentencing that [Movant] agreed that his offense[s] involved over 100 firearms." (D.E. 100 at 11). Respondent observes that counsel argued that the offenses involved fewer than 100 firearms, but Respondent has not specifically addressed Movant's contention that the District Judge may have been misled by the AUSA's characterization of what transpired at the plea hearing.

It is true that the AUSA's characterization of the Plea Agreement was technically inaccurate to the extent that the AUSA suggested that Movant had agreed when he pleaded guilty that he had

previously admitted to acquiring 20-to-30 firearms every three to four months.[2] As discussed above, Movant claimed at the plea hearing that he had told the ATF agent that he acquired only 10 firearms every three to four months. *See supra* pg. 3. But the AUSA never said that Movant "agreed that his offense[s] involved over 100 firearms." The AUSA's comments at the sentencing, like the Plea Agreement itself, referenced only what Movant had *previously told the ATF agent* about the number of firearms. This is a subtle distinction, but it is material one, for the reasons explained below.

If Plaintiff had stuck with the story he articulated at the plea hearing, he might have a good argument when he now asserts that counsel should have objected to the AUSA's characterization of what transpired at the plea hearing. However, Movant changed his story considerably between the plea and sentencing hearings. At the plea hearing, Movant simply denied having told the ATF agent that he acquired 20-to-30 firearms every three-to-four months, testifying instead that he had told the ATF agent that he acquired only 10 firearms every three-to-four months. (*See* E.T. at 1:48:12–48:42). By the time counsel filed the Plea Memorandum on Movant's behalf, Movant implicitly acknowledged that he had told the ATF agent that he had acquired 20-to-30 firearms every three-to-four months, but Movant asserted instead that he "greatly over estimated the number of weapons."[3] (D.E. 80). Then, at the sentencing hearing, Movant added that he "tried to tell [the ATF agent] it was eight to ten every time" he delivered weapons to his contact in San Antonio and that Movant had only purchased 20-to-30 firearms on the third or fourth trip. (D.E. 94 at 5:10–16). Evidently, Movant's theory at this point was that he was unable to effectively communicate to the ATF agent

---

[2] The Court assumes that the AUSA who represented the Government at the sentencing hearing was unaware of his misstatement. A different attorney represented the Government at the plea hearing, (*see* D.E. 52), and because the Plea Agreement was not changed to reflect Movant's objections, the AUSA who represented the Government at the sentencing hearing certainly was simply unaware that Movant objected to the number of firearms stated in the factual basis of the plea agreement at the plea hearing.

[3] If Movant disagrees with the position counsel took in the Plea Memorandum, he has not said so. Particularly since Movant is now represented by retained habeas counsel, the Court believes it is therefore fair to assume that Movant has no disagreement with the way counsel characterized Movant's position in the Plea Memorandum.

the fact that the ATF agent had misunderstood him (despite being given two opportunities to do so) because Movant was "all nervous and scared" and "wasn't thinking right." (*Id.* at 5:14–16)).

Under these circumstances, the Court cannot conclude that counsel performed deficiently in failing to object to the way the AUSA characterized what transpired at the plea hearing. At the plea hearing, Movant did deny telling the ATF agent he acquired 20-to-30 firearms every three-to-four months, but he abandoned that position by the sentencing hearing. When given an opportunity to speak on his own behalf by the District Judge, Movant claimed both that he had overestimated the number of firearms and also that the ATF agent had misunderstood Movant somehow. (*See* D.E. 94 at 5:1–16). Neither of these explanations is consistent with Movant's objections during the plea hearing, and in light of the ATF agent's credible testimony at the sentencing hearing, counsel may have reasonably concluded that it was more prudent to explain Movant's statement to the ATF agent rather than to deny that it ever occurred. Presumably, that is why counsel offered to stipulate at the sentencing hearing that Movant told the ATF agent he acquired 20-to-30 firearms every three-to-four months, (*id. at* 5:21-23). Movant does not appear to fault counsel for offering this stipulation, and it certainly appears to have been the wisest course of conduct under the circumstances. On the other hand, counsel could only have undermined Movant's case by objecting to the AUSA's remarks but then stipulating—consistent with Movant's testimony at that hearing—that Movant told the ATF agent he acquired 20-to-30 firearms every three-to-four months.

Assuming *arguendo* that counsel should have objected to the AUSA's characterization of the plea hearing, Movant has failed to establish that he was prejudiced by such failure on counsel's part. In explaining his rationale for overruling Movant's objection to the eight-level enhancement, the District Judge referenced the Plea Agreement, but the District Judge also explicitly credited the ATF agent's testimony. (D.E. 94 at 13–15). Movant suggests that the District Judge might not have applied the enhancement had the District Judge been told that Movant objected to the Plea

Agreement at the plea hearing, but this Court sees no reason to believe that is the case. Had counsel provided the Court with a more complete picture of what occurred at the plea hearing, the District Judge's decision to credit the testimony of the ATF agent would have still provided an independent basis for applying the eight-level enhancement. Further, as mentioned above, by the time of the sentencing hearing, Movant seems to have largely abandoned the position he articulated at the plea hearing. Having himself implicitly repudiated at the sentencing hearing the position he took at the plea hearing, it is difficult to see how Movant could have been prejudiced by counsel's strategic decision not to raise an objection that would have only served to undermine the credibility of the explanation Movant offered at the sentencing hearing.

The only case Movant relies on to support this argument is *United States v. Hagman*, 740 3d 1044 (5th Cir. 2014), which is inapposite to Movant's case. In the first place, *Hagman* was a direct criminal appeal, not a habeas case, so it did not address any issues related to ineffective assistance of counsel, much less the sort of ineffectiveness alleged here. Furthermore, the type of error that led the Fifth Circuit to remand for resentencing in *Hagman* clearly was not present in this case. In *Hagman*, the District Court had imposed a four-level enhancement after finding that Hagman's offense involved between eight and twenty-four firearms. *Id.* at 1046. In reaching this conclusion, the District Court had relied on Hagman's admission that he had illegally possessed and bartered with one stolen firearm, and on testimony from a law enforcement official who reported that a total of twelve firearms were missing from the victim's inventory. *Id.* at 1049. The Fifth Circuit agreed that the fact that twelve firearms went missing around the time of Hagman's offense was a "questionable coincidence," but concluded that this coincidence alone was insufficient to support the four-level enhancement. *Id.* at 1052.

In contrast, the District Judge's finding that Movant was involved in trafficking at least 100 firearms was supported by the ATF agent's credible testimony concerning what Movant admitted

during post-arrest interviews—testimony Movant did not directly dispute by the time of the sentencing hearing. (*Compare* D.E. 94, *with* Sentencing Transcript, D.E. 35, *United States v. Hagman*, No. 7:12-CR-162 (Oct. 3, 2012)). *Hagman* has no application here, and since Movant has articulated no other argument for how counsel could have been ineffective in failing to object to the AUSA's characterization of the plea hearing, the Court find's Movant's conclusory allegation of ineffectiveness to be without merit. The Court therefore recommends that this claim be dismissed.

### 2.      Failure to Object to the Government's Extrapolation Method

Movant also faults counsel for failing "to challenge the Government's extrapolation method to reach the threshold quantity of 100 firearms." (D.E 100 at 12). As Movant correctly notes, "[w]hen using an extrapolation method to estimate quantity, a conservative estimate should be applied." (*Id.* (citing *United States v. Valdez*, 453 252 (5th Cir. 2006)). Movant also correctly notes that the Indictment accused Movant of acquiring 20-to-30 firearms every three-to-four months between December 2011 and December 2012. (D.E. 100 at 12–13: D.E. 9 at 1–3). Averaging these estimates, Movant asserts that 86 is a reasonable estimate of the number of firearms involved in Movants' offenses. (D.E. 100 at 13). Had the District Judge accepted Movant's estimate, Movant would have been subject to a six-level enhancement instead of the eight-level he received after the District Judge found the offenses involved more than 100 firearms. Consequently, Movant asserts that counsel "should have pointed to the above logic when arguing the objection at sentencing." (*Id.*).

Though Movant's argument is creative, it is based on at least three faulty assumptions. First, it ignores the fact that the P.S.I. Report also attributed to Movant five firearms in addition to the 100 firearms it attributed to Movant by way of the extrapolation method. Consequently, if the District Judge had accepted Movant's preferred extrapolation, the District Judge would have found Movant responsible for 91 firearms, not 86. Secondly, Movant's estimate that the offenses involved 86 firearms has little basis in reality. Movant apparently arrived at that estimate by dividing the duration

of the conspiracy as indicated in the Indictment (12 months) by the average of Movant's estimates about the frequency with which he sent weapons to his contact in San Antonio (every 3.5 months), then multiplying the resulting figure by the average of Movant's estimates about the number of firearms included in each delivery (25 firearms), and finally rounding the result (85.714) to the nearest whole number.[4]

The obvious problem with this method is that, assuming the District Judge had accepted Movant's proposed averages and the assertion that the conspiracy lasted only twelve months, the District Judge (in addition to ignoring the other five firearms discussed in the P.S.I. Report) would have had to find that Movant delivered firearms to his contacts in San Antonio on roughly three-and-a-half occasions in order to conclude that Movant's offenses involved 86 firearms. It makes little sense to talk about driving across the State of Texas on "three-and-a-half" occasions, so the only way the District Judge could have reasonably arrived at Movant's preferred estimate is to find that Movant actually delivered weapons to San Antonio on at least four occasions and that one of those deliveries involved fewer weapons than the other three trips. In other words, the District Judge would have had to arbitrarily change at least one of the variables used in the extrapolation for Movant's estimate to make any sense.

A better approach would have been for the District Judge to use the low end of Movant's estimates for purposes of the extrapolation, and that is exactly what the District Judge did. This brings us to the third and most fundamental problem with Movant's argument—it is premised on the incorrect assumption that the relevant time period for purposes of the Government's extrapolation was twelve months. This assumption is consistent with the Indictment, but it *is not* consistent with

---

[4] Throughout this litigation, the parties have most frequently stated that Movant "acquired" a certain number of firearms (usually 20 to 30) every three-to-four months. (*See, e.g.*, D.E. 9 at 3). However, the Indictment, the Plea Agreement, and the P.S.I. Report all tie these acquisitions to deliveries to Movant's contact in San Antonio. (*Id.*). These documents indicate that Movant made most of the deliveries himself, but three of the deliveries were made by Movant's co-defendant, Brian Connell. (*Id.*).

the P.S.I. Report. The Indictment alleged that Movant "acquired approximately 20 to 30 firearms . . . every three to four months" "[d]uring the time frame of the conspiracy," which the Indictment alleged lasted between December 2011 and December 10, 2012. (*See* D.E. 9 at 1–3). The Plea Agreement was not as specific, indicating simply that Movant had acquired "about 20 to 30 firearms every three to four months since 2011."[5] The P.S.I. Report, however, indicated that Movant acquired "20 to 30 firearms [on] average every three to four months since *April 2011*." (P.S.I. Report at 20 (emphasis added)). In other words, the P.S.I. Report indicated that the conspiracy lasted longer than had been specifically alleged in the Indictment, and the Plea Agreement was vague enough to be consistent with either starting point. Movant has apparently overlooked these differences, which means there is simply no basis for Movant's assertion that "the Government only reached the threshold quantity by using the high end of both factors." (D.E. 100 at 13).

Contrary to what Movant now claims, the District Judge's finding that the Movant's offenses involved 105 firearms was, as the P.S.I. Report put it, a "conservative estimate." (P.S.I. Report at 20). In adopting the P.S.I. Report, the District Judge assumed, based on what Movant told the ATF agent, that Movant had acquired 5 firearms in 2010 and at least 20 firearms every four months between April 2011 and December 2012. In other words, in extrapolating the number of firearms Movant had acquired, the District Judge used the low end of Movant's estimates about the quantity and frequency of his acquisitions. By way of comparison, had the District Judge used the average of these estimates (as Movant does in arriving at his estimate of 86 firearms), the District Judge would have found Movant responsible for 148 firearms. If the District Judge had used the high end of these estimates (as Movant accuses the District Judge of doing), the District Judge would have found Movant responsible for 205 firearms, which would have triggered a ten-level enhancement instead of the eight-level enhancement Movant received. *See* U.S.S.G. § 2K2.1(b)(1)(E).

<hr />

[5] Of course, as described above, Movant claimed at the plea hearing that the correct figure was only 10 firearms every three-to-four months.

At the sentencing hearing, neither Movant nor his attorney challenged the P.S.I. Report to the extent that it indicated that Movant began regularly acquiring firearms in April 2011 rather than December 2011, and Movant does not now fault counsel for failing to do so. On the other hand, the record contains evidence supporting the District Judge's decision to adopt the P.S.I. Report in this respect. For example, the P.S.I. Report indicates that Movant's wife bought firearms at Movant's direction beginning in April 2011, (P.S.I. Report at 10), and the ATF agent testified at the sentencing hearing that Movant "stated that every three to four months he acquired 20 to 30 firearms and did that over a period of about *a year to a year and a half*." (D.E. 94 at 7:12–14 (emphasis added)). Further, the P.S.I. Report indicates that during his interview with the ATF agent Movant "estimated making six to eight trips to San Antonio to drop off weapons," which means that Movant must have either made trips to San Antonio with greater frequency than every three months or over a longer duration than twelve months.[6] (*Id.* at 17). In any event, taking Movant at his word that he made at least six trips to San Antonio and that he delivered at least 20 weapons each time, Movant's offenses clearly involved more than the 105 firearms the District Judge ended up attributing to Movant.

Had the District Judge accepted Movant's testimony at the sentencing hearing, it may not have mattered that the District Judge found that the duration of Movant's acquisitions lasted longer than indicated in the Indictment. However, once the District Judge credited the ATF agent's testimony that Movant had estimated that he acquired 20-to-30 firearms every three-to-four months, the duration of those acquisitions became potentially dispositive of the question of whether Movant was responsible for more than 100 firearms. In the absence of any evidence or even argument that the District Court erred in finding, by a preponderance of the evidence, that Movant began trafficking in firearms at regular intervals prior to December 2011, this Court cannot conclude that counsel was ineffective in failing to object to the Government's extrapolation method. The factual assumptions

---

[6] As mentioned above, Brian Connell also made three trips to San Antonio at Movant's direction. *See supra* note 4 and accompanying text.

underlying Movant's ineffective assistance of counsel claim are simply incorrect, so any objection on the part of counsel would have been frivolous. Since "counsel is not required to make frivolous objections," *Williams v. United States*, 684 F.Supp.2d 807, 819 (W.D. Tex. 2010) (citing *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)), this claim is without merit and should be dismissed.

## B.     Failure to Move for a Downward Departure Based on Immigration Status

Movant is not an American citizen, so his conviction in this case means that he will likely be deported once he finishes serving his sentence. (*See* D.E. 94 at 13:16–14:10). As a result, Movant claims that he will likely serve "an extended, second sentence in an immigration facility" while awaiting deportation, and will also have to "leave his family behind upon any deportation that results." (D.E. 100 at 15). In light of these adverse results, Movant faults counsel for failing to move for a downward departure on the basis of Movant's immigration status. According to Movant, "[t]hese constitute exceptional factors that [the District] Court could have used in applying a downward departure from the sentence that Mr. Compean ultimately received."[7] (*Id.*).

In support of this argument, Movant cites a number of cases in which courts have recognized that, in rare circumstances, it is appropriate for a sentencing court to grant a downward departure due to the adverse immigration consequences of the defendant's conviction. *See, e.g.*, *United States v. Rodriguez-Montelongo*, 263 F.3d 429, 433–34 (5th Cir. 2001); *United States v. Tesilos*, 965 F.Supp.2d 1034, 1041–42 (W.D. Wis. 2013); *Morales v. United States*, No. EP:5-CR-1775, 2007 WL 1857084 at *3 (W.D. Tex. June 5, 2007). What Movant does not cite is a single case in which any federal court has ever found an attorney ineffective in failing to argue for such a departure. Indeed, in *Morales*, the district court actually rejected the precise sort of ineffective assistance of counsel claim

---

[7] The Court uses the term "downward departure" because that is the term Movant uses, but what the Court understands Movant to actually mean is that counsel should have argued that Movant's immigration status was a mitigating factor justifying a downward variance from the properly-calculated guideline range. *United States v. Robinson*, 741 F.3d 588, 600 (5th Cir. 2014) (quoting *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012)) (explaining the difference between a "departure" and a "variance").

Movant raises here. 2007 WL 1857084 at *3. As that court explained, "'[t]he common facts of a long sentence and likely deportation' do not by themselves make a case extraordinary such as to warrant a downward departure." *Id.* (quoting *United States v. Maldonado*, 242 F.3d 1, 4–5 (1st Cir. 2001)); *see also United States v. Elias-Sanchez*, No. C:6-CR-453, 2007 WL 2220967 at *4–5 (S.D. Tex. July 30, 2007).

The only exceptional circumstances Movant has alleged are his cultural and familial ties to the United States, but these are not all that exceptional for people in Movant's situation. In fiscal year 2014, Immigration and Customs Enforcement removed some 87,000 individuals who had previously been convicted of crimes, not counting those individuals who were apprehended while attempting to enter the United States unlawfully. *ICE Enforcement and Removal Operations Report*, U.S. Immigration and Customs Enforcement (Dec. 19, 2014), available at https://www.ice.gov/doclib/about/offices/ero/pdf/2014-ice-immigration-removals.pdf. Many of these individuals had strong cultural and familial ties to the United States. *See, e.g.*, *Holder v. Martinez-Guitierrez*, 132 S.Ct. 2011, 2016–17 (2012) (agreeing with the Immigration Judge that a lawful permanent resident was ineligible for cancellation of removal where he was brought to the United States illegally at the age of five and was convicted of a federal crime at the age of twenty-two); *Franco-Casasola v. Holder*, 773 F.3d 33, 35–43 (5th Cir. 2014) (dismissing a Petition for Review from the denial of cancellation of removal where a lawful permanent resident had been convicted of a federal crime but alleged close family ties to the United States). Considering that Movant received the lowest possible within-guidelines sentences, and that such sentences are presumed to be reasonable, *United States v. Jefferson*, 751 F.3d 314, 323 (5th Cir. 2014), it is exceedingly unlikely that Movant would have received a lower sentence had counsel urged the District Judge to consider Movant's immigration status a mitigating factor.

In any event, it is not possible for Movant to show prejudice arising from counsel's failure to explicitly raise this argument because counsel did, in fact, highlight Movant's immigration status to the District Judge. Immediately before the District Judge pronounced sentence upon Movant, counsel and the District Judge engaged in the following discussion:

**Ms. Scown:** And I would also like the record to reflect that [Movant] is not a citizen of the United States. I have spoken with him at length about the effects that the plea offer and the plea bargain would have or the plea arrangement would have on his ability to get status in the future. I have also contacted other attorneys who deal in immigration law to be . . . make sure that he was advised properly about what the alternatives were and what his options were. That was taken into account before we made any agreement with the Government.

**The Court:** So you informed [Movant] that there's a good chance he's going to be deported.

**Movant:** Yes.

**Ms. Scown:** Yes, your Honor.

**The Court:** Okay

**Movant:** I know.

**Ms. Scown:** I also informed him that there is a really good chance that he will not ever be able to get legal status in this country.

(D.E. 94 at 13:16–14:13). It is true that counsel did not specifically argue that Movant's immigration status warranted a below-guidelines sentence, but it would have been difficult for counsel to do more than she did to highlight to the District Judge the fact that Movant will likely be deported once he serves his sentences. The District Judge surely took Movant's immigration status into consideration in arriving as what he believed were reasonable sentences for Movants offenses, so it is not possible that Movant was prejudiced by counsel's argument to make this mitigation argument more specific. As such, the Court recommends that this claim be dismissed as well.

## IV.    CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability ("COA") may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court of the United States fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *see also, Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). According to the Supreme Court:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack*, 529 U.S. at 484. In this case, it is respectfully recommended that reasonable jurists could not find the dismissal of Movant's Section 2255 case on substantive or procedural grounds debatable or wrong, nor could reasonable jurists find that the issues presented are adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended that the Court find that Movant is not entitled to a certificate of appealability as to his claims.

## V.  RECOMMENDATION

In accordance with the preceding discussion, the undersigned **RECOMMENDS** that the District Court **DISMISS WITH PREJUDICE** Movant Miguel Angel Compean's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody under 28 U.S.C. § 2255. (D.E. 100). It is further recommended that a certificate of appealability be **DENIED**. Finally, it is recommended that any pending motions be **DENIED** as moot.

### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

In the event that a party *has not been served* by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc); 28 U.S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72.

SIGNED this 5th day of March, 2015.

_____
DAVID COUNTS
U.S. MAGISTRATE JUDGE